COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-321-CR
  
  
SCOTT NELSON REDWINE                                                      APPELLANT
  
V.
  
THE STATE OF TEXAS                                                                  STATE
  
  
------------
 
FROM THE 362ND DISTRICT COURT OF DENTON COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
        Appellant 
Scott Nelson Redwine appeals his conviction for felony driving while intoxicated 
(DWI). A jury found Appellant guilty and assessed his punishment at five 
years’ confinement. The trial court sentenced him accordingly. In two points, 
Appellant challenges the legal and factual sufficiency of the evidence to 
support his conviction. The parties are familiar with the facts, and the 
controlling law is well-settled. We will affirm.
        Because 
Appellant raises a factual sufficiency complaint, we will discuss the most 
important and relevant evidence that supports his complaint.[2]  
Deputy Sheriff Jason McCall testified that, on December 17, 2002, he observed a 
truck drift toward the yellow line in the middle of FM 455 before the vehicle 
swerved to the right across the solid white line. Deputy McCall also stated that 
he observed the truck maneuver two S-shaped curves but that the truck then 
drifted over to the left into oncoming traffic, at which point Deputy McCall 
turned on his overhead lights. According to Deputy McCall, the driver of the 
truck did not pull over, so Deputy McCall turned on his sirens and followed him 
for approximately half of a mile to a mile. Deputy McCall testified that the 
truck eventually pulled over into a driveway to a house and a nearby mobile home 
and that Appellant got out, stumbled, and “fell into the side of the box 
enclosure that’s on the back of the truck.”
        Deputy 
McCall approached Appellant, identified himself, and asked for Appellant’s 
identification. Deputy McCall testified that Appellant “had glassy red eyes, 
slurred speech like he was kind of thick tongued, [and] a strong odor of an 
alcoholic beverage about his person.” Deputy McCall testified that, because 
Appellant was staggering as he walked, he told Appellant to wait in his truck 
while he ran a computer check on his license. Ignoring Deputy McCall’s 
request, Appellant got out of his truck, walked to a gate opening into a 
pasture, and stepped over a barbed wire fence in the field. Deputy McCall yelled 
at Appellant to stop, but Appellant started jogging in response.
        Deputy 
McCall ran after him through the field and caught up with Appellant on the porch 
of a mobile home. As Appellant was fidgeting with a locked door, Deputy McCall 
grabbed Appellant’s belt loop and arrested him. According to Deputy McCall, 
Appellant was “staggering left and right,” and at one point, he had to grab 
Appellant, who stumbled, to prevent him from falling to the ground.
        Deputy 
McCall testified that he thought Appellant was intoxicated and that there was 
not an opportunity to conduct any field sobriety tests at the roadside stop 
because Appellant fled and then became uncooperative. While Appellant was being 
driven to the station, he was belligerent, cussing, and calling Deputy McCall a 
“punk rookie,” among other things.
        Deputy 
McCall testified that this was his first DWI arrest, but he testified that he 
had previously encountered people who were intoxicated. Deputy McCall testified 
that, based upon his training, his experience, and his observations of 
Appellant’s behavior at the scene of the stop, he believed that Appellant was 
intoxicated at the time he stopped Appellant.
        Deputy 
Jeffrey Coats testified that he assisted Deputy McCall at the intoxilyzer room 
on December 17, 2002 a little after midnight “with a suspect believed to be 
intoxicated.” Deputy Coats stated that when he first observed Appellant, 
Appellant was “verbally belligerent and had an odor of alcohol about his 
breath.” Deputy Coats also testified that Appellant’s eyes were bloodshot 
and red. Deputy Coats testified that he recorded the events in the intoxilyzer 
room on videotape.
        During 
trial, the State played the videotape from the intoxilyzer room for the jury and 
questioned Deputy Coats about what happened in the intoxilyzer room as it 
appeared on the tape. Deputy Coats first asked Appellant to stand in a black box 
on the floor and to face the camera so that he could perform field sobriety 
tests on Appellant. Appellant refused to face the camera and then sat down in a 
nearby chair. Deputy Coats read Appellant his statutory DWI warnings and asked 
him what his name and date of birth were. Appellant repeatedly referred to the 
police as “pricks” and ”motherfuckers” and claimed that he was wrongly 
taken from his house. Appellant also repeatedly asked whether the camera in the 
intoxilyzer room was working, and he stated that he had a video camera on his 
house.
        According 
to Deputy Coats and the videotape, Appellant refused to give a breath specimen, 
and he refused to perform any field sobriety tests in the intoxilyzer room. 
Deputy Coats testified that, based on his training and experience and his 
observation of Appellant in the intoxilyzer room, Appellant had lost the use of 
his mental and physical faculties from the consumption of alcohol.
        At 
trial, Appellant testified on his own behalf and presented a different story of 
what happened. He first apologized to the court and to the jury for his 
language, “[n]ot the meaning of it, but the words I used.” Appellant 
testified that he had used such language because he had been wrongly accused and 
arrested. Appellant testified that he lives off of FM 455 on Bobby and Johnny 
Marriott’s property. Appellant admitted that, after he ate a sandwich from 
Burger King, he went to a bar named the Four Horsemen around 8:30 p.m. and 
stayed until midnight, having a beer an hour. When asked how many total beers he 
drank, Appellant responded, “Four at the max.” Appellant testified that he 
had no other alcoholic drinks that night.
        Appellant 
testified that his home was around three miles from the Four Horsemen and that 
he drove his Ford truck home. Appellant denied being intoxicated when he left 
the bar and stated, “I don’t drive when I’m intoxicated. I drive when 
I’m drinking, but I don’t drive intoxicated.” Appellant admitted that he 
has been in trouble before for DWI, but he testified that “[t]hat is why I 
don’t drive drunk” anymore.[3]
        Appellant 
disputed Deputy McCall’s testimony about other cars being on the road and 
claimed that he could not remember crossing the lines, adding that if he had, it 
was because his “old truck is sort of loose.” Appellant testified that he 
did not see any lights or hear any sirens while driving down FM 455. On 
cross-examination, Appellant testified that he would have stopped if he had 
heard any sirens. Appellant testified that he pulled into his driveway, put his 
truck in park, and got out of his car. Appellant testified that he went through 
his gate, went over to the fence, crossed it, and was there “talking to [his] 
wolf” when Deputy McCall approached him. Appellant then clarified that he was 
petting his dog.
        Appellant 
testified that Deputy McCall told him he was being arrested for DWI and that he 
was “in shock.” When asked whether he was angry, Appellant responded, “Oh, 
upset, angry. I mean, it was like destroying America right there, you know. I 
was mad.” Appellant testified that Deputy McCall did not ask him any 
questions, conduct any field sobriety tests on him, or look at his eyes. When 
asked whether he had difficulty walking to Deputy McCall’s car, Appellant 
testified that he had “arthritis real bad” and that his “shin bones are 
bowing out.”
        Appellant 
again apologized to the court and the jury for how he acted in the intoxilyzer 
room, as shown on the videotape. Appellant testified that the reason he sat in 
the chair was because he was “being defiant,” and he acknowledged that 
Deputy Coats “probably” wanted him to stand up. Appellant explained that he 
did not take a breath test “[b]ecause they can be manipulated.” Appellant 
also testified that he thought “his buddy” had put a camera on his barn, so 
that was why he had said on the tape that there was a camera on his house and 
the Marriott’s house. On cross-examination, the State asked Appellant,
  
[I]t’s 
your testimony that you’re just standing on your -- or right there at the 
front door of your residence petting your dog and this officer just walks up 
behind you and calls you by your name for no reason at all and handcuffs you and 
takes you to jail, tells you he’s arresting you for driving while intoxicated 
and takes you to jail. And that’s your -- what you story is, that’s what he 
did.
 
 
Appellant responded, 
“Absolutely.” Appellant then called eight witnesses who testified to his 
reputation for truthfulness in the community.
        The 
jury heard and considered the testimony of the two officers involved with 
Appellant on the night of his arrest. The jury also saw the videotape made of 
Appellant while he was at the station and was therefore able to view and 
consider the quality of Appellant’s speech, demeanor, mannerisms, and walk 
shortly after he was arrested. Further, the jury heard and considered 
Appellant’s own account of the events leading up to and following his arrest 
and from several witnesses who vouched for his reputation for truthfulness in 
the community. After hearing and considering all of the evidence presented, the 
jury found Appellant guilty of felony DWI and assessed his punishment at five 
years’ confinement.
        Based 
on our review of the testimony, videotape, and other evidence, under the 
applicable standards of review,[4] giving due 
deference to the factfinder’s determinations, we conclude that the evidence 
presented at trial was legally and factually sufficient to support Appellant’s 
conviction for felony DWI.
        We 
therefore overrule Appellant’s two points and affirm the trial court’s 
judgment.
   
  
                                                          ANNE 
GARDNER
                                                          JUSTICE
  
 
PANEL B:   HOLMAN, 
GARDNER, and WALKER, JJ.
 
DO NOT PUBLISH
Tex. R. 
App. P. 47.2(b)
 
DELIVERED: August 12, 2004


NOTES
1.  See 
Tex. R. App. P. 47.4.
2.  See 
Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
3.  
The State offered into evidence Appellant’s stipulation to two prior DWI 
convictions.
4.  See 
Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) 
(providing legal sufficiency standard of review); Burden v. State, 55 
S.W.3d 608, 612 (Tex. Crim. App. 2001) (same); Zuniga v. State, No. 
539-02, 2004 WL 840786, at *4, 7, 9 (Tex. Crim. App. Apr. 21, 2004) (stating 
factual sufficiency review standard).